# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED

**Jun 14, 2023**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of | ) | |
| | ) | |
| a green Apple iPhone, which is currently | ) | Case No.   2:23-sw-0591 CKD |
| located at ATF Sacramento | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 841(a), 846; | Conspiracy to distribute and possess with intent to distribute controlled |
| 18 U.S.C. § 922(g)(1) | substances; distribution of a controlled substance; felon in possession of a firearm |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

Daniel Lynch, ATF Special Agent

*Printed name and title*

Sworn to me and signed telephonically.

Date:   June 14, 2023 at 12:18 pm

*Judge's signature*

City and state:  Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge

**<u>Affidavit In Support of an Application for a Warrant to Search Device</u>**

I, Daniel Lynch, being first duly sworn, depose and state as follows:

## I.   <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.  I have been so employed since December 2021.  I graduated from the Federal Law Enforcement Training Center ("FLETC") with a certification in Criminal Investigation Training Program ("CITP") and ATF Special Agent Basic Training (SABT).  During my FLETC training, I was instructed in Investigative Operations, Enforcement Operations, Cyber Investigations, and Counterterrorism among other training modules.  The CITP academy was approximately three months in duration, and the SABT academy was also approximately three months in duration.  I investigate violations of federal criminal statutes, including violations of federal firearms and narcotics laws.  Prior to becoming an ATF Special Agent, I served four years in the United States Army as an Infantryman.  I completed a fifteen-month deployment to Iraq in support of Operation Iraqi Freedom.  My primary duties included the detection and apprehension of terrorists.  I graduated cum laude with a Bachelor of Science in Criminal Justice from the California State University, Sacramento in June 2020.

2.      During my tenure as an ATF Special Agent, I have investigated violations of both federal and state laws pertaining to narcotics trafficking and firearms violations.  During those investigations I have become familiar with the means in which illegal users of narcotic and persons prohibited from possessing firearms receive and or obtain firearms.  I have also become familiar with the means in which narcotics traffickers obtain and distribute narcotics, both through

my own on-the-job experience and through speaking with other officers who have experience investigating these types of cases.

3.      I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

4.      I am currently assigned to the ATF Sacramento Field Office as a member of a regional task force.  While conducting task force related operations, I have observed illegal firearm transfers and drug distribution.  Through my training and experience, I am familiar with the modus operandi of individuals illegally trafficking firearms and drugs.

5.      The facts in this affidavit come from my personal observations, my training and experience, review of evidence in this case, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6.      Through my training and experience, I know that mobile telephones store text messages sent, received, and drafted by the user.  The text message history in a narcotics and or firearms trafficker's mobile telephone can contain evidence of narcotics and or firearms trafficking because it shows the communications or plans of a narcotics and or firearms trafficker and his or her associates and contacts.  Mobile telephones also receive and store voicemails and call records, which shows who is calling the user, and may explain why they are calling.  Mobile telephones have other user-entered data files, such as "notes" and "to-do lists," which can provide evidence of a crime when a narcotics and or firearms trafficker stores data related to the crime using those files.  Mobile telephone companies also store the data described in this paragraph on their servers and

associate the data with particular users' mobile telephones.

7.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## II.     ITEM TO BE SEARCHED

8.     The property to be searched is a green Apple iPhone, ATF Case Number 786035-21-0044, Item Number 000033, hereinafter the "Subject Device." The Subject Device is currently in ATF custody at 1325 J Street, Suite 1520 in Sacramento, California.

9.     The applied-for warrant would authorize the forensic examination of the Subject Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## III.     SUMMARY OF PROBABLE CAUSE

10.     Beginning in 2021 and continuing to present, ATF has been investigating Shaun JONES for being a felon in possession of a firearm, distribution of a controlled substance, and a conspiracy to distribute and possess with intent to distribute controlled substances.  During the investigation, JONES used phone number (510) 680-0247 to communicate with a confidential informant and arrange firearms and narcotics transactions.  On March 31, 2023, law enforcement arrested JONES pursuant to a federal arrest warrant and found JONES in possession of one mobile telephone at the time of his arrest, which I now seek authorization to search.

## IV.     FACTS IN SUPPORT OF PROBABLE CAUSE

11.     On August 23, 2022, an ATF Confidential Informant ("CI-1") purchased a Glock 17, 9mm firearm, with serial number BHCD060, from Shaun JONES and Kenyatta ALEXANDER for $1,300 in cash.  CI-1 was driving an undercover vehicle ("UCV") during the operation.  CI-1 was outfitted with a concealed audio transmitter and a covert video recorder.  Law enforcement provided

CI-1 with prerecorded funds for the purchase.  Prior to leaving the staging location, law enforcement searched CI-1 and the UCV for unauthorized contraband and found none.

12.     CI-1 and JONES had previously communicated about meeting in Sacramento for the firearms transaction.  JONES directed CI-1 to meet in the area of Chevron located at Stockton Boulevard and Fruitridge Road.

13.     CI-1 arrived at the meet location.  JONES exited the passenger side of a black Jeep with California license plate 8ZXZ644.  JONES then entered the front passenger area of the UCV.  JONES advised that the firearm was in a different car, and then JONES advised CI-1 to come get into the other car so that JONES did not have to be, "doing all that."

14.     CI-1 exited the UCV and entered the rear passenger area of a white sedan while JONES entered the front passenger area.  Once inside the sedan, the driver (later identified as ALEXANDER) provided CI-1 with the Glock firearm.  CI-1 provided ALEXANDER with $1,300 in cash.  CI-1 advised that CI-1 knew where to customize firearms.  ALEXANDER stated that he had recently had multiple firearms, but that he currently did not have any additional firearms.  ALEXANDER then told CI-1 to take his telephone number, but CI-1 asked JONES if that would be, "stepping on toes."  JONES stated, "No, you good brody, you straight." ALEXANDER then provided CI-1 with a telephone number of (916) 465-3928. JONES then stated, "Everytime I bring a nigga into some busy, I'm bringing you into it so you can, you know."

15.     ALEXANDER was later charged with conspiracy to unlawfully deal firearms, unlawful dealing in firearms, and felon in possession of a firearm, based in part on the above-described conduct.  *See* Superseding Indictment, 2:22-CR-00058-DAD; ECF 96.

///

***JONES arranges a fentanyl deal for the ATF Confidential Informant.***

16.     On August 23, 2022, CI-1 contacted Shaun JONES over Facetime to ask if JONES could obtain counterfeit pharmaceutical pills that commonly contain fentanyl.  The Facetime audio was recorded and preserved as evidence.  JONES stated that he would contact an individual that sold those type of pills.  Shortly after speaking to JONES, CI-1 received a request on Instagram from username "sticklyfethr33z."

17.     CI-1 communicated with the individual via Instagram messaging.  CI-1 provided TFO Oliver with a screenshot from the Instagram profile.  TFO Oliver was able to identify Marcus MILLER, DOB xx/xx/1989, Sacramento County XREF 3684957, as the individual pictured in the screenshot.

18.     On September 2, 2022, under ATF's direction, CI-1 purchased 110 grams of suspected fentanyl pills from Marcus MILLER for $2,000 in cash.  The controlled purchase occurred in the parking lot located at 8241 Bruceville Road, Sacramento.

***ATF Confidential Informant purchases second firearm from JONES.***

19.     On September 11, 2022, CI-1 communicated with JONES by sending text messages to 510-680-0247.  CI-1 asked if JONES had a firearm for sale.  JONES replied, "Ima look around rn."  Based on my training and experience, I believe that JONES was confirming he would look around "right now" for a firearm to sell to CI-1.

20.     On September 23, 2022, JONES asked CI-1, "U still need the strap?"  CI-1 said "was the ticket tho," asking how much JONES would charge.  JONES responded, "G 42 around brand new," and "850."  Based on my training and experience, I believe that JONES was conveying that he had a Glock 42 available for $850.  CI-1 responded, "Bet shit ill throw a exta bill hold it for me i still 5etting these blues off rn," meaning CI-1 would purchase the firearm, but needed JONES to

hold it for CI-1.  JONES then responded "I juss got word it's way in az lemme see what's closer," and, "I mean he can send it I'm tryna put it together."  Based on my training and experience, I believe JONES was conveying that someone had just told him the firearm was in Arizona, however, JONES could arrange to have the firearm brought or shipped to California.

21.    On September 28, 2022, JONES told CI-1 that he had a Glock 19 with a high-capacity magazine available.  CI-1 said CI-1 was interested and asked for a picture of it.  JONES sent the below picture:



22.    On September 30, 2022, at approximately 1:38 p.m., JONES called CI-1 to confirm that the firearm purchase would be completed that day.  CI-1 confirmed the meeting would take place that day.

23.     On September 30, 2022, at approximately 2:48 p.m., JONES called CI-1 to say that he had a 9mm Gen 5 Glock available for sale.  Including a large capacity magazine, the firearm would cost $1,200.  CI-1 then told JONES to meet at the boxing gym located off Broadway in Sacramento to complete the deal.  JONES sent the following picture to CI-1:



24.     Law enforcement directed CI-1 to buy the above firearm from JONES through a controlled purchase.  CI-1 was driving a UCV during the operation.  CI-1 was outfitted with a concealed audio transmitter and a covert video recorder.  Law enforcement provided CI-1 with prerecorded funds for the purchase.  Prior to leaving the staging location, law enforcement searched CI-1 and the UCV for unauthorized contraband and found none.

25.     At approximately 5:04 p.m., CI-1 parked at Flawless Boxing and Fitness located at 600 Broadway, Sacramento, CA 95818.  At approximately 5:38 p.m., JONES entered the UCV.  The covert recording devices captured a photo of JONES.  Law enforcement compared this photo to JONES' most recent booking photo to confirm his identity.



26.     JONES began explaining to CI-1 how to open up a cannabis store in the Sacramento area.  CI-1 mentioned a cannabis store named "Lemonade," located at 1115 Fee Drive in Sacramento, California.  JONES said, "we hit that."  Based on my training and experience, I believe JONES was referring his participation in robbing the "Lemonade" cannabis store.  JONES said that the store "didn't have no weed in it" and that "there were safes in there."  JONES then asked, "you talking about Lemonade by Arden?" and added, "my other partner hit it before me, then we went back and hit it and hit the building next to it…breaking into that mother fucker."  Based on my training and experience, I believe JONES was referring to multiple burglaries.

27.     At approximately 5:44 p.m., JONES told CI-1, "theres hella Glocks around too right now" and "I don't fuck with the ghosts."  "Ghosts" is a slang term for privately manufactured firearms.  JONES said that privately manufactured firearms are not as reliable as commercially manufactured firearms.  Jones added, "I would never get into a shoot out with one of them."

28.     CI-1 mentioned a recent shooting in the Sacramento area.  JONES responded that he had heard of the shooting and that it was related to another

shooting that took place the same night.  JONES told CI-1 that the victim of the shooting was one of the main drug distributers in Sacramento.  JONES said that the victim sold pounds of crystal methamphetamine and fentanyl.

29.     At approximately 5:48 p.m., JONES stepped out of the UCV and contacted individuals that had arrived in the parking lot driving a white Honda sedan.  JONES then returned to the UCV, removed a Glock pistol from his front waistband, and set the pistol on the center console.  CI-1 checked out the pistol and paid JONES $1,200.

30.     Following the controlled purchase, CI-1 then drove away from the meet location, followed by surveilling law enforcement officers.  CI-1 met with law enforcement to debrief the operation and provided the firearm that CI-1 purchased from JONES.

31.     The firearm is a Glock 17, 9x19mm pistol, bearing serial number BRDU980, depicted below.  The firearm was equipped with a 30-round magazine. An ATF interstate nexus expert reviewed pictures of the firearm and preliminarily determined the firearm traveled across state lines.



***ATF Confidential Informant purchases narcotics from JONES.***

32.     On November 14, 2022, JONES called CI-1 from phone number 510-

680-0247, which is the same number JONES previously used to coordinate selling a firearm to CI-1. CI-1 did not answer JONES' call. At approximately 4:44 p.m., CI-1 texted JONES, "Bruh said he grabb like 150 to 200 of em," meaning that the CI would like to buy pills from JONES. CI-1 told JONES that the deal would have to occur the following day because he/she was out of town. Shortly thereafter, JONES texted CI-1 stating "They might be gon but then," meaning that JONES may have sold the pills by then.

33.    On November 15, 2022, at approximately 11:05 a.m., CI-1 texted JONES, "Aye bro just hit and asked if those still gud," asking if the pills were still available. At approximately 7:10 p.m., JONES texted CI-1, "Still got pulls fa sale top," meaning that JONES still had pills he was willing to sell. CI-1 texted JONES, "Bet bet shit ill pull up tmmrw wit my bitch rn eatin how msny." JONES replied, "Norco 5's 7.5's an perc 5's an 7.5s," meaning that he had Norco and Percocet pills available for sale in various strengths.

34.    On November 16, 2022, law enforcement directed CI-1 to conduct the controlled purchase. CI-1 was driving an UCV during the operation. Another confidential informant, CI-2, accompanied CI-1 as a passenger in the UCV in order to deter a possibility of a robbery. CI-1 was outfitted with a concealed audio transmitter, which enabled investigators to listen to CI-1's conversations, and a covert video recorder. Law enforcement gave CI-1 prerecorded U.S. currency with which CI-1 was to purchase the suspected pharmaceutical pills from JONES. Prior to leaving the staging location, law enforcement searched CI-1, CI-2, and the UCV for unauthorized contraband and found none.

35.     At approximately 6:31 p.m., CI-1 and CI-2 parked next to a Starbucks coffee shop located at 4241 Elverta Road in Antelope, California. A few minutes later, a marked police vehicle unrelated to this investigation arrived at the meet location and parked near the UCV.  CI-1 and JONES agreed to move to a different part of the parking lot.  Thereafter, JONES (depicted below) entered the UCV carrying a plastic bag.



36.     JONES began removing bottles containing pills from the plastic bag and asked the CIs if they had a piece of paper that the pills could be placed on for counting.  JONES and both CIs began inspecting and counting the pills.



37.     CI-1 and JONES discussed which pills CI-1 would buy and began negotiating prices.  CI-1 and JONES agreed on $3,100 for the pills the CIs stated that they wanted.  CI-1 counted $3,100 of pre-recorded funds and exchanged it for the pills, which JONES provided in pill bottles.

38.     The CIs drove away from the meet location, followed by surveilling law enforcement officers.  The CIs later met with law enforcement to debrief the operation.  CI-1 and CI-2 gave me the pills they had purchased from JONES.  The pills weighed approximately 235 grams.

39.     I examined all the pharmaceutical pills that CI-1 had purchased from JONES and compared the pills to known pictures of authentic pharmaceutical pills listed on the containers that the pills had been provided in.  I concluded that the purchased pills were identical to the pictures of confirmed authentic pharmaceutical pills. I identified the pills as follows:

     a.  OxyContin 20mg, a schedule II controlled substance;

     b.  Hydrocodone Bitartrate and Acetaminophen 7.5mg/325mg, a schedule II controlled substance;

     c.  Oxycodone and Acetaminophen 7.5mg/325mg, a schedule II controlled substance.

### JONES is believed to be involved in a burglary ring to obtain controlled substances.

40.     Since November 2021, ATF has been assisting Sacramento Police Department ("SPD") detectives with an investigation into multiple robberies and burglaries committed at marijuana dispensaries in the Sacramento area. Detectives initially identified JONES as an individual involved in the robberies/burglaries.  Additionally, detectives determined that JONES was listed as a suspect in past violent crime incidents, to include armed robbery, at least fifteen burglaries, battery, distribution of narcotics, and was believed to have been involved

in additional crimes within the Eastern District of California.

41.     On December 15, 2022, law enforcement learned that JONES was on active GPS tracking as a condition of his pre-trial probation in Sacramento County. TFO Oliver obtained a search warrant for JONES' geolocation data.  2:23-sw-0062-KJN.

42.     On March 31, 2023, law enforcement obtained an arrest warrant and criminal complaint charging JONES with being a felon in possession of a firearm and with distribution of a controlled substance.  2:23-MJ-151-AC.[1]  Later that day, law enforcement and personnel from the Sacramento County Probation Department served the federal arrest warrant for Shaun JONES at 2802 Chelan Ct, Antelope, CA 95843.  This was the residence listed with Sacramento County pre-trial probation for JONES as of March 31, 2023.

43.     JONES's Sacramento County pre-trial probation GPS ankle monitor showed that JONES was present at the residence at the time of warrant execution. At approximately 16:32 hours, members of the SSO SED team initiated the service of the federal arrest warrant at 2802 Chelan Court.  SSO SED made multiple announcements of their presence and demanded any occupants of 2802 Chelan Court to exit the residence. During SSO SED's announcements, surveilling law enforcement officers saw movement through the windows of the east side of the home.

44.     SSO SED then made a dynamic entry into the front door of the residence. At this time, a male later identified as JONES escaped through a small window on the south side of the residence and began to flee. SSO SED members along with SPD officers began to pursue JONES on foot. JONES was apprehended in the backyard of a nearby residence. JONES was handcuffed behind the back and

---

[1] A grand jury subsequently returned an indictment charging JONES with the same charges; *see* 2:23-CR-114-KJM.

placed into a marked SPD vehicle.

45. Haley Goodchild and Blaze Goodchild, along with two small children, were located in the residence at the time of the warrant service. All occupants of the residence were brought out to the street until the residence was secured. SSO SED conducted a tactical clearance of 2802 Chelan Court for the purpose of officer safety.

46. After SSO SED cleared the residence, ATF assisted SCPD with a pre-trial probation search of the residence. Per SCPD Officer Brenda Cuevas, JONES was on searchable pretrial probation. During the search, law enforcement found a Glock pistol, model 20C, with no serial number and an aftermarket .40 caliber barrel, depicted below:

 

The firearm was found in a black backpack located in the kitchen and was loaded with 23 rounds of .40 caliber ammunition. JONES is prohibited from possessing firearms because he has previously been convicted of a crime punishable by more than one year in prison.

47. Also inside the backpack, officers found a green Apple iPhone (the Subject Device), the above mentioned Glock pistol, JONES' certificate of vital records (birth certificate), a headlamp flashlight, a one-pound bag of rubber bands, 960 grams (net weight including packaging) of packaged cannabis products, and a

red plastic bottle containing suspected promethazine syrup.

48.    Elsewhere in the kitchen, officers found keys to a storage unit.

49.    In the garage, officers found a large black duffle back containing a flashlight, bolt cutters, adjustable pry bar, 36" pry bar, angle grinder, and sledgehammer (below left); and a clear plastic tote containing cannabis products (below right).



Elsewhere in the garage, officers located miscellaneous pharmaceutical pill bottles and pills. In the laundry room, officers located a large black trash bag containing 15.3 kilograms (net weight) of packaged cannabis product, depicted below:



50.     At approximately 6:02 p.m., SA Lynch and TFO Franzen asked JONES if he would be willing to talk with investigators. JONES agreed and was read his Miranda warning by TFO Franzen. The interview was recorded on TFO Franzen's body worn camera. JONES asked why he was being arrested. SA Lynch read the two charges that were listed on the arrest warrant, felon in possession of a firearm and distribution of a controlled substance.

51.     TFO Franzen asked Jones if he was the owner of the Glock pistol that was located in JONES's residence. JONES stated that the pistol was not his and that he does not know where it came from. JONES was asked if his prints or DNA would be on the pistol that was found in JONES' house, JONES stated that his prints or DNA would not be on the pistol.

52.     TFO Franzen asked if JONES was a member of any gang. JONES said he is not a member of any gang. JONES was then transported to the William J. Kinney Police facility for further questioning in another recorded interview. Law enforcement again read JONES his *Miranda* rights. JONES agreed to talk to us but refused to sign an advice of rights and waiver form.

53.     SA Lynch asked JONES where he was in the early hours of March 31, 2023. JONES stated that he was at home. SA Lynch told JONES that his GPS coordinates from JONES's pre-trial probation ankle monitor were pinging at a pharmacy burglary that took place at the CareZone Pharmacy located at 860 Harbour Way S, Suite E, Richmond, CA 94804 at 5:00 a.m. JONES stated that he was not at the burglary.

54.     TFO Franzen asked JONES what he does for work, JONES stated that he was currently not working. TFO Franzen then asked how JONES was able to afford all of the marijuana that was found in the home at the time of the search. JONES responded, "weed is cheap."

55.     At approximately 7:44 p.m., TFO Franzen and SA Lynch ended the interview. JONES was then transported and booked into the Sacramento County Main Jail.

## V.     TECHNICAL TERMS

56.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a)     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b)     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include

17

various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c) Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d) GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e)      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f)      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

g)      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

57.    Based on my training, experience, and research, I know that the

19

Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

58.    Based on my training, experience, and research, I know that wireless telephones, such as the Subject Device, can store and transfer large amounts of data.  I also know that individuals involved in crimes such as distribution of narcotics will often switch devices to avoid law enforcement detection.  I know that when obtaining a new device, the user may change the type of phone, the cellular provider, the telephone number, and other identifiers related to the wireless telephone, but the user will often transfer data from one wireless telephone to another telephone.  The data transferred to the new wireless telephone often contains almost all the data on the phone that will be discarded.  The data to be transferred is not dependent upon the original date that the data was stored upon the previous wireless telephone, and the data can be stored for an indefinite length of time.  The data can also be transferred multiple times between multiple wireless telephones.

## VI.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

60.    Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a)    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of

a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b)    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d)    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

61.    <u>Nature of examination.</u> Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

62.    <u>Manner of execution.</u> Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this

warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VII.        CONCLUSION

63.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/
Daniel Lynch
Special Agent
Bureau of Alcohol, Tobacco, and
Firearms

Subscribed to me and sworn telephonically on:  June 14, 2023

The Honorable Carolyn K. Delaney
United States Magistrate Judge

Approved as to form by:

/s/ *Emily G. Sauvageau*
Emily G. Sauvageau
Assistant United States Attorney

## **ATTACHMENT A**

The property to be searched is a green Apple iPhone (the "Subject Device"). The Subject Device is currently in ATF custody at 1325 J Street, Suite 1520 in Sacramento, California.

This warrant authorizes the forensic examination of the Subject Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Subject Device described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1), 18 U.S.C. § 922(g)(1), and involve Shaun JONES, including:

1.      All names, words, telephone numbers, email addresses, time/date information, messages, or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with the subject individuals during execution of the warrant.  This authority to search such mobile telephones includes the following within each mobile telephone:

      a.  Incoming call history;

      b.  Outgoing call history;

      c.  Missed call history;

      d.  Outgoing text messages;

      e.  Incoming text messages;

      f.  Draft text messages;

      g.  Telephone book;

      h.  Data screen or file identifying the telephone number associated with the
mobile telephone searched;

      i.  Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

      j.  Voicemail;

      k.  User-entered messages (such as to-do lists);

      l.  Photographs;

      m.  Lists of customers and related identifying information;

      n.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

o. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

p. All bank records, checks, credit card bills, account information, and other financial records; and

q. Any passwords used to access the electronic data described above.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ⟩ | |
| ⟩ | |
| a green Apple iPhone, ⟩ | Case No.   2:23-sw-0591 CKD |
| which is currently located at ATF Sacramento ⟩ | |
| ⟩ | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 27, 2023 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   June 14, 2023 at 12:18 pm                                       _Carolyn K. Delaney_
                                                                                                                  *Judge's signature*

City and state:      Sacramento, California                    Carolyn K. Delaney, U.S. Magistrate Judge
                                                                                                    *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____

_____          _____
      Signature of Judge                                                        Date

**<u>ATTACHMENT A</u>**

The property to be searched is a green Apple iPhone (the "Subject Device"). The Subject Device is currently in ATF custody at 1325 J Street, Suite 1520 in Sacramento, California.

This warrant authorizes the forensic examination of the Subject Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Subject Device described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1), 18 U.S.C. § 922(g)(1), and involve Shaun JONES, including:

1.      All names, words, telephone numbers, email addresses, time/date information, messages, or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with the subject individuals during execution of the warrant.  This authority to search such mobile telephones includes the following within each mobile telephone:

      a. Incoming call history;

      b. Outgoing call history;

      c. Missed call history;

      d. Outgoing text messages;

      e. Incoming text messages;

      f. Draft text messages;

      g. Telephone book;

      h. Data screen or file identifying the telephone number associated with the
mobile telephone searched;

      i. Data screen, file, or writing containing serial numbers or other
information to identify the mobile telephone searched;

      j. Voicemail;

      k. User-entered messages (such as to-do lists);

      l. Photographs;

      m. Lists of customers and related identifying information;

      n. Types, amounts, and prices of drugs trafficked as well as dates, places,
and amounts of specific transactions;

o. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

p. All bank records, checks, credit card bills, account information, and other financial records; and

q. Any passwords used to access the electronic data described above.

2.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.    This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.